**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANNETTE ENGEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-240 Erie |
| | ) | |
| JEFFERSON PILOT FINANCIAL | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

In this ERISA action the Plaintiff, Annette Engel, challenges a plan administrator's decision to deny her request for payment of benefits under a long-term disability policy issued by Defendant, Jefferson Pilot Financial Insurance Company ("Defendant"). Presently pending before the Court are the parties cross-motions for summary judgment.

**I. BACKGROUND**

Plaintiff was at all relevant times employed by Harborcreek Youth Services, Inc. as a Clinical Director. By virtue of her employment, she was a participant in the group long-term disability plan ("the Plan") issued by Defendant, which provides disability benefits in the event that a participant becomes totally disabled. It is undisputed that the Plan is an employer-sponsored benefit program that is subject to the Employee Retirement Income Security Act of 1974 ("ERISA") as amended, 29 U.S.C. 1003(a).

According to the Plan, "totally disabled" is defined as follows:

> 1.   During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness, the Insured is unable to perform all of the Main Duties of his or her Own Occupation.
>
> 2.   After the Own Occupation Period, it means that due to an Injury or Sickness, the Insured Employee is unable to perform all of the Main Duties of any Gainful Occupation. ...

(AR 0041).[1] In addition, for certain specified injuries or sicknesses such as "chronic fatigue

---

[1]References to "AR ___" are to the exhibits submitted by Defendant in support of its motion for summary judgment. See [Doc. No. 17]. References to "Ex. ___" are to the exhibits submitted by the Plaintiff in support of her motion for summary judgment. See [Doc. No. 15].

sickness," "mental sickness" and "musculoskeletal/connective tissue injury or sickness," Plan benefits are limited to 24 months for any one period of disability unless the participant is confined to a hospital.  (AR 0061).[2]

### 1.    Initial review by Defendant

On September 5, 2007, Plaintiff applied for long-term disability benefits alleging disability due to exhaustion and pain exacerbated by stress and long hours.  (Ex. 2).  In support of

---

[2]These conditions are defined under the Plan as follows:

**"Chronic Fatigue Sickness"** means a sickness that is characterized by debilitating fatigue, in the absence of other known medical or psychological conditions.  It includes, but is not limited to:
1.    chronic fatigue syndrome or chronic fatigue immunodeficiency syndrome;
2.    an Epstein-Barr or herpes 6 viral infection, or post viral syndrome; and
3.    limbic encephalopathy or myalgic encephalomyelitis.

It does **not** include depression or any neoplastic, neurologic, endocrine, hematologic or rheumatologic disorder.

•       •       •

**"Mental Sickness"** means any emotional, behavioral, psychological, personality, adjustment, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome; regardless of its cause.  It includes, but is not limited to:
1.    schizophrenia or schizoaffective disorder;
2.    bipolar affective disorder, manic depression, or other psychosis; and
3.    obsessive-compulsive, depressive, panic or anxiety disorders.

These conditions are usually treated by a psychiatrist, a clinical psychologist or other qualified mental health care provider.  Treatment usually involves psychotherapy, psychotropic drugs or similar methods of treatment.

•       •       •

**"Musculoskeletal/Connective Tissue Injury or Sickness"** includes, but is not limited to:

•       •       •

4.    fibromyalgia, carpal tunnel syndrome, or repetitive motion syndrome; ...

•       •       •

(AR 0061-0062).

her claim she submitted the treatment notes of Brenda Stringer, M.D., of the Fibromyalgia and Fatigue Centers; treatment notes from Christie Ray, M.D., her primary care physician; and a physician's statement completed by Dr. Ray dated September 9, 2007.

Dr. Stringer's notes show that Plaintiff was evaluated on May 8, 2007 for complaints of fatigue, headaches, stiffness and soreness. (AR 0226-0227). Plaintiff reported that she was only able to sleep uninterrupted for two hours per night and that a previous sleep study had revealed the absence of REM sleep. (AR 0226). Dr. Stringer found 11 fibromyalgia tender points on physical examination, and diagnosed the Plaintiff with chronic fatigue and immune dysfunction syndrome, fibromyalgia, hyperthyroid and depression. (AR 0227). On May 30, 2007, Plaintiff reported continuing sleep problems. (AR 0225). Dr. Stringer reiterated her previous diagnosis and also recommended B12 injections for a perceived B12 deficiency (AR 0225). During her office visit of June 25, 2007, Plaintiff complained of increased stress at work, feeling constantly tired, and of an inability to get more than fours hours of uninterrupted sleep at night. (AR 0217). She also reported an incident at work where she had passed out after discontinuing her blood pressure medication. (AR 0217). Dr. Stringer prescribed Neurontin for her sleep problems. (AR 0217). Plaintiff reported that she was sleeping somewhat longer at her office visit of August 22, 2007, but noted continuing problems in falling asleep and short term memory problems. (AR 0214).

Dr. Ray's notes reflect that on August 29, 2007, Plaintiff complained of migraines, soreness and muscle aches and problems with stress. (AR 0202-0203). By report, some migraines were so severe that she was passing out. (AR 0203). She diagnosed her with migraines and fibromyalgia. (AR 0203). Dr. Ray completed a physician statement dated September 9, 2007, wherein she opined that the Plaintiff was totally disabled due to fibromyalgia, chronic pain, migraine headaches and syncope. (Ex. 3). She noted in that report that the Plaintiff's symptoms included severe pain, fatigue, memory loss, syncope and migraine headaches. (Ex. 3). Objective findings of trigger point tenderness and loss of strength were noted. (Ex. 3). She concluded that Plaintiff was "unlikely [to] make [a] full recovery" and could only sit for two hours, stand for one hour, walk for one hour in an eight hour day and not lift more than 25 pounds. (Ex. 3).

Following the submission of the previously described medical information, Defendant requested a description of the Plaintiff's job duties from her employer. (AR 0256-0257). A job

description was supplied which described the Plaintiff's primary duties as follows:

1.   Provides vision and leadership to the SCS clinical services by developing and refining programs, implementing the strategic plan, developing a team and learning environment, and interpreting the agency's mission, philosophy, objectives and goals as needed.

2.   Develops proposals for new programs for review by the CEO and approval by the Board of Directors.

5.   Formulates and implements policies and procedures affecting the agency's SCS clinical services, with approval by the CEO.  Ensures that all policies, procedures and structures for the effective operation and integration of agency services are followed, and refined as necessary.

6.   Ensures that prospective clinicians are recruited, interviewed and hired to provide for effective staff complement at all times, in accordance with agency policies and procedures.  Conducts exit interviews or ensures that they are conducted for all SCS clinical staff leaving a regular position.

7.   Provides ongoing SCS clinical consultation to therapists and agency managers.

8.   Chairs all agency SCS clinical meetings ensuring professional and ethical treatment to all clients and families.

9.   Monitors adherence to national standards and state regulations regarding clinical standards and conduct.

10.  Assists in the development of new SCS treatment approaches and programs within the agency.

11.  Actively facilitates and promotes collaboration of quality and compliance activities across divisions/departments as well as, clients, family and referral agencies.

12.  Serves as a member of the agency's administrative team.

(AR 0278) (incorrect numbering in original).  This position required her to supervise approximately six people; continuously relate to others; engage in written and verbal communication; engage in reasoning, math and language; and exercise independent judgment. (AR 0256).  Physically, she was required to continuously stand; frequently walk and sit; occasionally lift and carry 25 pounds; and perform computer work with the use of both hands. (AR 0256-0257).

The initial review of the Plaintiff's claim was conducted by Carla Tierno-Hogue, RN,

4

BSN, CCM, who concluded, following her consideration of the submitted medicals records and the Plaintiff's job description, that there was insufficient documentation of physical limitations or cognitive defects that would support any restrictions or limitations precluding the ability to perform her own occupation. (AR 0085). Defendant subsequently denied the Plaintiff's claim on October 30, 2007 stating:

> [T]he medical documentation contained in your claim file does not support Total Disability as defined by this policy. You were diagnosed with fibromyalgia, chronic pain, migraine headaches and syncope. You had complaints of fatigue, poor sleep, pain, and passing out. According to the medical records on file your pain level as of 08/29/2007 was 3/10, and as of 08/22/2007 you were getting six hours of uninterrupted sleep. It was also indicated that you could lift up to 25 pounds. If you disagree with our decision, you may appeal this determination by following the steps outlined below.

(AR 0199). Plaintiff was informed of her right to request a review, including the right to submit additional documentation in support of her claim, such as "[m]edical records to support your appeal such as office and treatment notes, laboratory results, x-rays and testing results." (AR 0199).

### 2.    *Second review by Defendant*

By letter dated December 3, 2007, Plaintiff appealed the Defendant's denial of benefits dated October 30, 2007. (AR 0190-0193). In her letter, the Plaintiff stated, in part:

> I am writing to appeal your decision of denying my Long Term Disability claim and benefits. I am totally disabled at this time and have been from the beginning of the elimination period. I have been diagnosed with Fibromyalgia Syndrome which is a condition recognized by the FDA.
>
> Fibromyalgia Syndrome (FMS) is a widespread musculoskeltal (sic) pain and fatigue disorder. Fibromyalgia means pain in the muscles, ligaments and tendons - the soft fibrous tissues in the body. I ache all over every single day. My muscles twitch; burn and I have stabbing pains in the neck area most days. Do you remember the last time you had a really bad flu; every muscle in your body shouted out in pain. That is what I feel every single day. In addition, I am devoid of energy. There is a physical exam that Dr. Stringer preformed (sic) that shows that I have at least 11 out of the 18 tender points or trigger points. I have widespread pain in all four quadrants of my body. The most painful trigger points are in my neck, shoulders, chest, hips and elbows. There are days that I lay flat on my back all day without watching TV or anything because the pain is so acute.
>
> I have also been diagnosed with Chronic Fatigue Syndrome

(CFS) that is closely related to FMS and usually goes hand in hand with it.  My fatigue is incapacitating.  I have "brain fatigue" or "brain fog" in which I feel totally drained of energy, have problems with short-term memory and concentration.  My boss can attest to the problems that I was having with concentration and memory prior to taking Family Medical Leave at his request because he knew that I could no longer handle my job.

I have been diagnosed with a sleep disorder in which I have problems falling asleep and wake up throughout the night.  In the denial letter, it specifies that I was getting six hours of uninterrupted sleep nightly.  I am not sure if I misunderstood the question or if you misinterpreted the information, but I do not ever get six hours of uninterrupted sleep.  I am up at least three or four times to run to the bathroom due to Irritable Bowel Syndrome.  I did have a sleep lab test that indicated that I do not go into REM sleep stage.  I will forward that information to you.  Researchers find that most FMS patient's stage 4 sleep is interrupted by bursts of awake-like brain activity as well.  I wake up in the morning feeling like I was run over by a Mack truck at least 4x per week.  My husband can attest to all of this information.

•        •        •

I have also been diagnosed with Major Depressive Disorder, Recurrent and am on a very high level of antidepressant medication to combat this.  I take 400 mg of Wellbutrin and 40 mg of Celexa.  I have been suicidal several times since FMS has taken over my life.  It is incredibly hard to go from being an energetic, happy, very successful woman to being almost bed ridden.  It is not unusual for me to spend weeks in my house without leaving due to all the symptoms.  I have very little interest in the things that I used to do.  I cry easily and often.  I have depressed mood most of the day, nearly every day.  I have lost 20 pounds since the beginning of the elimination period, which should be documented in my medical records.  I have insomnia nearly every night.  I have fatigue and loss of energy every day.  I have feelings of worthlessness as I have gone from being a very committed Director of a residential youth treatment center to being at home.  I have a diminished ability to think or concentrate.  I do strange things like putting the telephone in the refrigerator, putting the milk into the cupboard instead of the refrigerator.  This week when I went to shave my legs, I started to use my toothbrush.  These are all symptoms of depression and FMS.  My mother, sister, best friend and husband can all attest to these symptoms.

I have been diagnosed with Migraines, Recurrent.  I have been hospitalized on one occasion for passing out from the migraines.  I have migraines approximately one time per week that are incapacitating.  I cannot get out of bed and stay in a completely dark and quiet room when I have migraines.  The incident in which I passed out was at work and can be documented by the medical department in the residential facility that I worked at.  Dr. Ray indicated that my passing out was from pain from Migraine and Fibromyalgia.  I have had one other incident of passing out at a

grocery store during the elimination period, after the hospitalization.

•     •     •

There were several errors in my denial letter. First, Dr. Ray is sending you a letter stating that she never documented that I had a 3/10-pain level on 8/29/07 per the denial letter. I have not had a pain level on any day lower than 7/10 since I first started suffering from Fibromyalgia. I don't know if this was a misinterpretation on your part or if something she wrote looked like a three.[3] Dr. Ray stated to me that she certainly would not have suggested to me that I take FMLA and keep me on it this entire time if I had only a 3 on a 10-point pain scale. She is well aware of my pain. She recently added Hydrocodone to the list of medications that I take for pain. These include: Hydrocodone, Fiorocet, Midrin, and Celebrex. I, obviously, do not take these medications together. I try very hard to use only the Celebrex on a daily basis, as I do not want to become addicted to painkillers. I do have a daily journal that Dr. Stringer has had me keep that rates my pain, fatigue, IBS, and sleep daily. I would be happy to provide a copy of that to you.

As per your decision that I could carry out the main duties of my occupation, I will be happy to get a letter from they (sic) CEO and HR Director at Harborcreek Youth Services. I was not able to carry out my duties. My boss allowed me to only work four days and stay home Wednesdays when I was first diagnosed and I still missed 3 days per week. HYS has already replaced my position with someone who is able to carry out the duties. I cannot go out to recruit when I am in pain. I cannot concentrate on a daily basis to write policies and procedure. Subordinates were questioning me before I left because they would tell me something or ask me to do something and I would not remember the conversations. I have a Clinical Therapist who worked for me that I am sure would testify to my memory issues as he was very confused by the change in me until I explained what was going on to him. He told me that he thought that I was "going crazy" as I had been an excellent boss to him and "all of a sudden" became "flighty and air-headed." A Director in a residential facility with 100 Juvenile Sex Offenders cannot be flighty and complete her job in a reasonable manner. I was putting my co-workers in jeopardy when I was on the floor in the residential facility as I was not able to help de-escalate or restrain boys when they became out of control. I was not able to keep up with the research in my field due to extreme fatigue. I think that it is very obvious that the job description that HYS has for me is very generic and general. It does not begin to describe the day-to-day operations that I was in charge of supervising and completing. I do not understand how your committee can deny my benefits when both my boss and my doctors have repeatedly said that I cannot do the requirements of

---

[3]Dr. Ray subsequently confirmed the misunderstanding of her treatment notes by separate letter dated December 3, 2007. (AR 0195).

> my job or any other job at this time. Dr. Ray has steadfastly refused for me to try to work part-time at the facility, as she knows that I am in severe pain.
>
> SSDI is sending me for a psychological with a Dr. Glenn Bailey, tomorrow, December 4th. If I am able to get a copy of that sent to you, I will. I will also have Dr. Stringer send you the information from my last two appointments when I see her on December 18th. I will have my sleep study sent to you if my doctor has not already sent it. I currently travel two hours to see Dr. Stringer who is not covered by my insurance. I see her because she is a specialist in Fibromyalgia. There are no such specialists in the Erie area. If you would like a second opinion, I will see a Rheumatologist in the Erie area.
>
> I am not sure if you have a current list of the medication and supplements that I am ordered to take, so I will enclose a list of them. Please reconsider your decision as I cannot go back to work, no matter what your decision is and my family will suffer.
>
> •      •      •

(AR 0190-0192) (footnote added).

In further support of her appeal, Plaintiff subsequently forwarded the results of a sleep study dated January 11, 2007, additional treatment notes from Dr. Stringer dated October 11, 2007 and December 11, 2007, a report from Dr. Ray dated September 12, 2007, and a report from Glenn Bailey, Ph.D. dated December 4, 2007 (AR 0152-0161). The sleep study results dated January 11, 2007, revealed the absence of REM sleep and slow wave sleep. (AR 0173-0174). Dr. Ray's report of September 12, 2007, stated:

> Annette Engel has a history of fibromyalgia. At this point her fibromyalgia is not well controlled. She is currently being treated by fibromyalgia and fatigue centers. With their help, hopefully she will improve greatly. She also has [a] history of migraines which are associated for her sycope (sic). When Annette's stress level escalates, her fibromyalgia is worse, which worsens her migraines. She is also having memory/concentration issues associate[d] with her fibromyalgia.
>
> At this point it was decided that Annette must take a full medical leave, which will allow for no work of any kind. I cannot supply an end date at this point. Basically, her medical problems are such that she cannot work in any capacity for an unknown period of time. She will be seen and treated by me as well as Dr. Stringer (fibromyalgia) and Dr. Esper (neurologist). Updates will be provided if requested regarding her medical fitness to return to work.

(AR 0245).

8

Dr. Stringer's additional treatment notes reflected that Plaintiff complained on October 11, 2007 that she "felt worse" and had been "passing out." (AR 0166). She reported that it took her two hours to fall asleep and that she was only getting two hours uninterrupted sleep at night. (AR 0166). Dr. Stringer found 15 tender points on evaluation. (AR 0166). The records of December 11, 2007 reflect that the Plaintiff reported a slight increase in her energy level, but complained of increasing headaches and inadequate sleep. (AR 0163).

Plaintiff also included a report by Glenn Bailey, Ph.D., to whom the Plaintiff had been referred for a mental status evaluation on December 4, 2007 by the Bureau of Disability Determination Social Security Office. (AR 0154-0161). He noted that the applicant's "claimed eligibility" was the result of "[f]ibromyalgia, chronic fatigue syndrome, migraines, [and] major depression." (AR 0154). Plaintiff complained of memory and concentration problems, depression, poor sleep and a decreased appetite. (AR 0155-0157). Dr. Bailey observed that she presented as a very depressed individual with a flat affect. (AR 0157). Under the heading "Personal Goals,", Dr. Bailey noted:

> She was asked what her personal goals are in life. She stated, "To get better. To feel better. I would like to go back to work. I really enjoyed working with the kids.

(AR 0160). Under the heading "Concentration, Persistence or Pace," he reported:

> Concentration and attention is "Not good. It stinks." She will sometimes be so internally preoccupied that she doe[s] things that she would normally [not] do. She gave some examples of some forgetful things that she did in the kitchen, nothing of which was real harmful, [s]he put objects in the refrigerator that did not belong there, and other situations where she was just preoccupied with what she was doing and not thinking about her actions.

(AR 0160).[4] He concluded that her progress was "guarded" and recommended she undergo individual psychotherapy. (AR 0159). He diagnosed her with the following conditions: Axis I, Major depression, recurrent, psychological factors affecting medical condition, PTSD symptoms; Axis III, Fibromyalgia, Migraines; Axis IV, Problems related to social environment, occupational problems; and Axis V, 50. (AR 0160-0161).

Following the submission of this additional evidence, a second review of the Plaintiff's claim was conducted by Joyce Mumm, RN, BSN MSHP on February 4, 2008. (AR 0083-0084).

---

[4]He administered the Folstein Mini Mental Status Examination, which is a cognitive test, and the Plaintiff scored 29 out of 30. (AR 0157).

In recommending denial of the claim, Ms. Mumm stated:

•       •       •

IN SUMMARY, CLMT WENT OUT 8/31/07 FOR SYMPTOMS OF DIFFUSE, CHRONIC PAIN (FIBROMYALGIA), MIGRAINES, FATIGUE, SYNCOPE, & IRRITABLE BOWEL SYNDROME.  DOCUMENTATION INDICATES THAT CLMT'S SERUM LAB TESTING IS IMPROVED & WAS STABLE WHEN CLMT WENT OUT.  THE FILE DOES NOT CONTAIN IMAGING OR TESTING SUCH AS AN EEG OR MRI TO INDICATE OBJECTIVE EVIDENCE OR PHYSICAL FINDINGS R/T REPORTS OF MIGRAINES & MEMORY PROBLEMS.  A SLEEP STUDY INDICATES NO SIGNIFICANT FINDINGS.  THE FILE CONTAINS NO PSYCHOTHERAPY DOCUMENTATION OR COUNSELING NOTES.  THE FILE CONTAINS NO GASTROINTESTINAL FINDINGS TO SUPPORT THE SEVERITY OF CLMT'S IRRITABLE BOWEL SYMPTOMS.  IT IS NOT EVIDENT PER FILE THAT CLMT HAS MUSCULOSKELETAL DEFICITS. THERE IS A LACK OF SUPPORTING MEDICAL EVIDENCE IN THE FILE INDICATING THE INABILITY OF CLMT TO PERFORM A SEDENTARY WORK CAPACITY.  JOYCE MUMM RN, BSN MSHP[.]

(AR 0084).

Relying on Ms. Mumm's recommendation, the Defendant again denied the Plaintiff's claim on February 12, 2008 stating:

In summary, the medical documentation does not support a condition that would render you unable to perform your occupation and does not support a total disability beyond the 180-day elimination period.  Medical records indicate serum lab testing is improved and were stable when you actually stopped working. Your file does not contain imaging or testing such as an EEG or MRI to indicate evidence or physical findings regarding reports of migraines and memory problems.  A sleep study indicates no significant findings.  There has been no cognitive testing.  Also, there are no gastrointestinal findings to support the severity of irritable bowel symptoms.  It is not evident in your records that you have musculoskeletal deficits.  Treatment is conservative in nature. We understand you may continue to have symptoms such as pain, however we fail to find your symptoms meet the policy provision of total disability.

(AR 0150).  Plaintiff was informed of her appeal rights, including the right to submit additional documentation in support of her claim, such as "office notes, laboratory results, x-rays and any other testing results to support your appeal."  (AR 0150).

### 3.      Third review by Defendant

Plaintiff appealed the denial of her claim on April 10, 2008, again stating that she was

unable to work due to fibromyalgia/chronic fatigue.  (AR 0132-0133).  She included a letter from her treating physician, Dr. Nosson Goldfarb, of the Fibromyalgia and Fatigue Center, dated April 3, 2008, which stated, *inter alia*:

> I first saw Mrs. Engel on 3/25/08.  At that time, I confirmed the diagnosis of chronic fatigue immunodeficiency syndrome (CFIDS) as well as fibromyalgia.  She meets the official criteria for both disorders.  For CFIDS this includes debilitating fatigue lasting at least six months with the exclusion of any other known medical condition and at least 4 other associated symptoms.  In Mrs. Engel's case these included impairment of short term memory and concentration sever[e] enough to cause a substantial reduction in a previous level of activity, muscle pain, multi-joint pain, headaches, unrefreshed sleep and post-exertional fatigue lasting more than 24 hours.  As far as the diagnosis of fibromyalgia, she has chronic widespread pain lasting more than three months in all four quadrants of her body as well as axial pain.  She also had pain in at least 11 of 18 trigger points on physical exam.
>
> A Mental Residual Functional Capacity Assessment was done by Christie Ray, MD on 12/20/07.  Dr. Ray confirms Mrs. Engel's limitations in memory and sustained concentration.  Dr. Ray also noted limitations in Mrs. Engel's ability to make occupational adjustments.
>
> A sleep study was performed in January of 2007.  In Ms. Henderson's letter she claims the sleep study "showed no significant findings."  This is inaccurate.  The report states "This sleep study is mildly abnormal.  There was prolonged awaking periods during the night.... It demonstrated reduction in total sleep time; reduced sleep efficiency and absence of slow wave sleep time and REM sleep time.  This is consistent with sleep initiation and maintenance insomnia."  Upon reviewing the actual findings, there is absolutely no stage 3, stage 4 or REM sleep.  Mrs. Engel spent the vast majority of her sleep time in stage 2 sleep.  In order for someone to obtain rejuvenating sleep, she must spend a significant portion of her sleep in stage 3 and 4.  Mrs. Engel had none and despite spending upwards of 12 to 13 hours sleeping she never wakens refreshed.
>
> As far as lab testing, Mrs. Engel does have significant abnormalities in a number of areas and despite a mild increase in B12 and thyroid levels on follow-up testing still remains suboptimal.  Regardless of lab values, however, Mrs. Engel remains extremely fatigued and in moderate to sever[e] pain.  She continues to have migraine headaches, irritable bowel symptoms with reflux, cannot fall asleep and has severe bouts of depression and anxiety.
>
> I have reviewed Mrs. Engel[']s job description as stated in the above mentioned letter.  I can equivocally state that she is currently incapable of fulfilling these duties and clearly lacks the stamina to work on an ongoing full-time basis.  Her constant state of pain,

> exhaustion and lack of mental clarity make these activities difficult if not impossible for her to perform.
>
> As far as the summary portion of the denial letter, I would like to emphasize that CFIDS and fibromyalgia are clinical diagnoses. There are no definitive lab studies or imaging studies that confirm or refute either of these diagnoses. Neither an EEG or MRI will provide useful information regarding migraine headaches or memory problems. The sleep study is certainly abnormal. Cognitive testing is unnecessary. Irritable bowel syndrome is again a clinical diagnosis and Mrs. Engel has symptoms consistent with this diagnosis. There are abnormal musculoskeletal signs on physical examination that again are consistent with the above mentioned disorders; namely, hyperreflexia and delayed relaxation phase as well as multiple trigger points.
>
> Mrs. Engel meets the criteria for CFIDS and fibromyalgia and is currently at a level of dysfunction to place her on disability.

(AR 0134-0135).

In the Mental Residual Functional Capacity Assessment dated December 20, 2007, referenced by Dr. Goldfarb, Dr. Ray concluded that Plaintiff suffered from fibromyalgia with severe neck pain, migraine headaches and depression/anxiety. (AR 0169). She also found that she suffered from poor memory; sleep disturbance; mood disturbance; recurrent panic attacks; feelings of guilt or worthlessness; pervasive loss of interest in activities; suicidal ideation or attempts; difficulty concentrating or thinking; decreased energy; and generalized persistent anxiety. (AR 00169). She noted that stressful situations produced memory and concentration deficits. (AR 0169). Dr. Ray concluded, *inter alia,* that the Plaintiff had "marked limitations" in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; make simple work-related decisions; complete a normal workday without interruptions from psychologically based symptoms and perform at a consistent pace; and deal with work stressors. (AR 0170-0171).

In further support of her appeal, the Plaintiff forwarded updated medical records from the Fibromyalgia and Fatigue Center relative to visits on January 21, 2008 and February 20, 2008, which documented continued complaints of fatigue. (AR 0110- 0111; 0114-0115). She also sent treatment notes from Gay L. Lipchik, Ph.D., who evaluated the Plaintiff for depression on April 8, 2008. (AR 0110). Dr. Lipchik's notes reflect that the Plaintiff reported significant symptoms of depression, anxiety and anxiety attacks. (AR 0112). Plaintiff informed Dr. Lipchik that she

was incapacitated by her fibromyalgia, with her average pain intensity being between 7 or 8 out of 10. (AR 0112). She recommended weekly/biweekly appointments focusing on behavioral/psychological interventions for her chronic pain, as well as behavioral treatment of her depression and anxiety. (AR 0112).

On May 2, 2008, Defendant referred the Plaintiff's file for review to Dr. Dayton Payne, a physician board certified in internal medicine and rheumatology, who issued a report dated May 9, 2008. (AR 0105-0108). In his report, Dr. Payne noted Plaintiff's history of fibromyalgia, multiple cognitive problems, hypertension, depression, hypothyroidism and headaches, as well as her complaints of fatigue, twitching and burning in her muscles, with stabbing pain in a diffuse and migratory pattern. (AR 0105). He summarized the various diagnostic studies and clinical findings, stating:

> The workup data I have available include a normal CBC and chemistry profile. The claimant's thyroid function studies are normal. There are titers for multiple viruses including Candida, CMV, herpes 6, and Epstein-Barr virus and all of these either reveal immunity or are negative. A sleep study revealed mildly abnormal prolonged sleep latency in 01/2007. The quantitative immunoglobulins were normal. The antibodies to Chlamydia reveal evidence of an old infection. The natural killer cell activity was normal. She had what appears to be a workup for a thrombotic process and this was negative. A CK level was normal. The antibodies to Mycoplasma revealed no specific findings. A B-12 and ESR were normal. The heavy metal screen was negative. The serology for rheumatic disease includes a negative RF, anti-CCP, and ANA.
>
> The examination findings throughout the medical record data reveal only the presence of muscular tender points consistent with fibromyalgia. There is no mention of any inflammatory findings including joint damage or destruction or any evidence of synovitis, weakness or atrophy. I do not see any extra-articular manifestations of any process that would be expected to be producing restrictions or limitations on activities.

(AR 0105). Dr. Payne concluded that the "treatment data supports therapies for depression, chronic pain and sleep problems," and agreed that the medical information "supports the diagnosis of fibromyalgia." (AR 0106). He disagreed, however, with the restrictions and limitations imposed by her treating physicians:

> Based on the information provided to this reviewer, I do not see any findings throughout the data that supports a need for restrictions or limitations on activities. The laboratory workup is completely unremarkable and the examination findings reveal no features of any process that would be expected to be producing

> restrictions. The examination findings throughout the medical
> record data reveal only the presence of muscular tender points
> consistent with fibromyalgia.

(AR 0107). Finally, Dr. Payne concluded that the Plaintiff had no physical or functional

impairments that would prevent her from performing the essential tasks and duties of her own

occupation:

> I do not see any such impairment from a **rheumatology viewpoint**
> that would have prevented the claimant from performing the
> essential tasks and duties of her occupation as a Director of
> Counseling for troubled youth.
>
> Following a careful and thorough review of the medical record data
> provided with emphasis upon the history, workup data,
> examination findings, treatment information, and clinical course
> information provided, I do not see any manifestations throughout
> that would necessitate the placement [of] restrictions or limitations
> on activities.

(AR 0107) (emphasis supplied).

On May 20, 2008, Defendant forwarded a copy of Dr. Payne's report to the Plaintiff's

counsel for review and response. (AR 0104). Plaintiff's counsel, in turn, forwarded Dr. Payne's

report to Dr. Goldfarb, who submitted a supplemental report dated June 4, 2008, wherein he

sharply disagreed with Dr. Payne's focus and conclusions. (AR 0089-0090). Dr. Goldfarb

stated:

> I would like to comment on a number of issues that Dr. Payne may
> have overlooked in his assessment. While he agrees that the
> medical information in this case supports the diagnosis of
> fibromyalgia, from a rheumatology viewpoint see (sic) no evidence
> of restrictions or limitations on activities. Mrs. Engel never
> claimed to have a rheumatologic basis for her inability to perform
> her duties at work. While she is in pain and does have some
> rheumatologic findings consistent with fibromyalgia (ie multiple
> tender points, hyper-reflexia and delayed relaxation of deep tendon
> reflexes,) Mrs. Engel's major complaints are debilitating fatigue,
> inability to concentrate and limitations in memory. Dr. Payne
> completely ignored the mental health assessment performed by Dr.
> Ray. As I mentioned in my initial letter:
>
> > "A Mental Residual Functional Capacity Assessment was
> > done by Christie Ray, MD on 12/20/07. Dr. Ray confirms
> > Mrs. Engel's limitations in memory and sustained
> > concentration. Dr. Ray also noted limitations in Mrs.
> > Engel's ability to make occupational adjustments.["]
>
> Dr. Payne also minimizes the findings on the sleep study
> performed. He notes the "sleep study revealed mildly abnormal

14

prolonged sleep latency." However, as I mention in my letter of April 3, Mrs. Engel has a severe dysfunction of sleep stages with no slow wave or REM sleep. Basically, Mrs. Engel is chronically sleep deprived and unless the problem can be corrected will continue to suffer from the mental incapacity she originally complained of.

In summary, Mrs. Engel does have objective evidence of both mental incapacity and sleep derangement which does explain her limitations in performing her duties as Director of Counseling for troubled youth. And she is not capable of functioning as per the general population.

(AR 0089-0090).

As a result of Dr. Goldfarb's letter, the Defendant referred the medical documentation to W. Brenard Francis, Ph.D. for further review on June 10, 2008. (AR 0073-0080). In this regard, a document styled "Medical Review Referral" generated by the Defendant stated:

06/10/08 ... NEED M/N REVIEW BY DR. FRANCIS ... 43 yof who worked as the director of counseling for troubled youth sex offenders. Sedentary occ with SVP of 8. She stopped working due to severe fatigue, memory problems, concentration problems, pain/fibromylagia (sic)/sleep problems/syncope, depression and anxiety. We had the file reviewed by a rheumatologist and the attorney states that reason clmt cannot work is due to debiliating (sic) fatigue, inability to concentrate and limitations in memory. In previous letters he sites her depression/anxiety as adding to these symptoms. This file has never been reviewed from a mental health standpoint. This claimant has been reluctant to seek therapy herself due to her line of work-embarrasment (sic). She states she knows she needs therapy and will then cancel therapy appointments. She had a psych eval done on 12/04/07 and began seeing a therapist on 04/08/08.

•        •        •

(AR 0082). Defendant requested that Dr. Francis address the following questions:

1.)    What significant findings do you see after reviewing the medical information?

2.)    Provide a description of ... Ms. Engel's impairment(s), if any, and outline how these impairments would translate into restrictions and limitations.

3.)    Are the restrictions and limitations placed upon Ms. Engel's work activities by her attending physician(s) reasonable and consistent with the medical findings? Please explain.

4.)    Based upon the medical evidence, did Ms. Engel have any mental/functional impairment(s) that would have prevented performance of the essential tasks and duties of her

15

occupation as a Director of Counseling for troubled youth/sex offenders (sedentary level occupation [PER Department of Labor guidelines] - SVP of 8) as of 08/31/07 forward?  Please explain.

5.)    Please identify Ms. Engel's current work capacity as it applies to Department of Labor guidelines and any associated medical restrictions and limitations as of current date and moving forward.

6.)    Please provide an evidence-based rationale for your conclusion.

•    •    •

(AR 0082).  In his assessment of June 18, 2008, Dr. Francis noted the Plaintiff's diagnoses of fibromyalgia, major depression, chronic pain, migraine headaches and syncope.  (AR 0073).  He reviewed and summarized the findings of Drs. Ray, Stringer, Bailey and Lipchik, as well as the Plaintiff's appeal letter dated December 3, 2007, wherein she set forth her symptoms and limitations.[5]  (AR 0074-0077).  He responded to the questions posed by the Defendant as follows:

•    •    •

2.  Provide a description of the claimant's impairment(s), if any, and outline how these impairments would translate into restrictions and limitations.

Medical records do not suggest or provide evidence that the claimant had any mental health impairment(s) that would translate into restrictions and limitations.

3.  Are the restrictions and limitations placed upon the claimant's work activities by her attending physician(s) reasonable and consistent with the medical findings?  Please explain.

No; the claimant was described as experiencing "passive suicidal ideation without intent or plan" and being compliant with fibromyalgia appointments.  There were no objective findings to specify restrictions and limitations relative to mental health functioning.

4.  Based upon the medical evidence, did the claimant have any mental/functional impairment(s) that would have prevented performance of the essential tasks and duties of her occupation as a Director of Counseling for troubled youth/sex offenders (sedentary level occupation) as of 08/31/07 forward?  Please explain.

---

[5]Notably absent from Dr. Francis' summary of the medical records which he reviewed is any reference to the reports generated by Dr. Goldfarb.

No; medical records stated that the claimant experienced depression secondary to Fibromyalgia and "the depression could be considered a well established side effect of fibromyalgia/chronic fatigue." Thus, the primary focus of treatment would have been for fibromyalgia, and with appropriate/effective treatment, the alleged depression may have dissipated. There were no objective measures to gauge the level of depression or anxiety that the claimant expressed.

5. Please identify the claimant's current work capacity, as it applies to Department of Labor guidelines and any associated medical restrictions and limitations as of current date and moving forward.

Medical records do not indicate or support evidence that the claimant would be unable to perform her duties as the Director of Counseling for troubled youth/sex offenders. Thus, the claimant would be able to comply with the Department of Labor guidelines for her occupation as of current date and moving forward.

6. Please provide an evidence-based rational for your conclusion.

Please review answers and responses to aforementioned questions for an evidence-based rationale for my conclusion(s).

•    •    •

(AR 0077-0078). Dr. Francis concluded by stating that "it might be beneficial to obtain subsequent psychotherapy records and objective data in order to fully assess levels of anxiety/depression expressed by the claimant." (AR 0079).

Defendant again denied the Plaintiff's claim on July 7, 2008. (AR 0065-0071). It explained the basis for its decision as follows:

We do not find that Ms. Engel's medical records support a mental health condition or memory problems severe enough to support restrictions and limitations to render her unable to perform the main duties of her occupation as a director of clinical services. She did not seek ongoing care for depression or anxiety from a mental health professional from 08/31/07 to the present.

Originally, Ms. Engel's physician and she herself said her fatigue was due to insomnia. A sleep study was performed on her 01/11/2007 and it was mildly abnormal. It was noted that the study was stopped early by the sleep technician due to computer problems. No further sleep studies have been performed since that time and it appears as of 03/25/2008 Dr. Goldfarb diagnosed Ms. Engel with chronic fatigue syndrome. Records show Ms. Engel was prescribed Ambien to help with her sleep in 10/07 through at least 12/07. Future treatment notes did not document if that medication was helping her or not. Treatment notes from 02/20/08 stated Ms. Engel reported Elavil was helping her with her sleep. Other than the letters from Dr. Goldfarb dated 04/03/08 and

> 06/04/08 stating Ms. Engel's fatigue is debilitating, we find that
> the treatment records do not support or document how Dr.
> Goldfarb is currently attempting to treat her condition or how it
> affects her activities of daily living and ability to function in a
> sedentary work setting.
>
> In considering all of Ms. Engel's complaints and all of the medical
> records in her claim file, we find that the records do not support
> ongoing restrictions and limitations due to her fibromyalgia,
> chronic fatigue syndrome, depression/anxiety or migraines that
> would render her unable to perform the main duties of her
> occupation as a director of clinical services from 08/31/07,
> throughout the contract's 180 day elimination period (02/27/08) or
> beyond.  Therefore, based on all of the reasons indicated in this
> letter, we are unable to overturn the denial of Ms. Engel's claim for
> long-term disability benefits.

(AR 0070-0071).  Plaintiff was further informed that she had exhausted her appeal rights.  (AR
0071).

## II. STANDARD OF REVIEW

### A.    *Summary judgment standard of review*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c).  In order to withstand a motion for summary judgment, the non-moving party

must "make a showing sufficient to establish the existence of [each] element essential to that

party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).  In evaluating whether the non-moving party has established

each necessary element, the Court must grant all reasonable inferences from the evidence to the

non-moving party.  Knabe v. Boury Corp., 114 F.3d 407, 410, n.4 (3d Cir. 1997) (citing

Matsuchita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.574 (1986)).  "Where the record

taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there

is no 'genuine issue for trial.'"  Id.  (quoting Matsushita, 475 U.S. at 587).

### B.    *ERISA standard of review*

Where the plan grants the administrator discretionary authority to construe the terms of

the plan, or to determine eligibility for benefits, the court may reverse a denial of benefits only if

the administrator's decision was "arbitrary and capricious."  Firestone Tire & Rubber Co. v.

Bruch, 489 U.S. 101, 115 (1989); Orvosh v. Program of Group Ins. for Salaried Employees of

Volkswagen of America, 222 F.3d 123, 128-29 (3rd Cir. 2000); Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3rd Cir. 1997); Abnathya v. Hoffmann-LaRoche, Inc., 2 F.3d 40, 45 (3rd Cir. 1993). Under the arbitrary and capricious standard, the court will overturn an administrator's decision if it is "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Abnathya, 2 F.3d at 45 (citations omitted). This scope of review is narrow and the court is not free to substitute its own judgment for that of the administrator in determining eligibility for plan benefits. Id. Here, the parties agree that the Plan document gives the Defendant discretionary authority to determine whether the Plaintiff qualified for long-term disability benefits (AR 0047), and therefore the deferential "arbitrary and capricious" standard applies.

Prior to the Supreme Court's decision in Metropolitan Life Ins. Co. v. Glenn, __ U.S. __, 128 S.Ct. 2343 (2008), the Third Circuit applied a "sliding scale" of deferential review wherein heightened scrutiny was appropriate where procedural or substantive conflicts existed. See Pinto v. Reliance Std. Life Ins. Co., 214 F.3d 377, 392 (3rd Cir. 2000). In Glenn, the Supreme Court concluded that a conflict of interest does not alter the standard of review from arbitrary and capricious, but rather, it is "but one factor among many that a reviewing judge must take into account." Glenn, 128 S.Ct. at 2351. The Glenn Court suggested a non-specific list of various factors that courts could consider in the arbitrary and capricious analysis, including: (1) ignoring an award of Social Security benefits after having encouraged the plaintiff to apply for such benefits; (2) emphasizing a treating physician's report favoring denial while deemphasizing other reports suggesting a contrary result; and (3) failing to provide its experts with all the relevant medical evidence. Glenn, 128 S.Ct. at 2352.

The Third Circuit in Estate of Schwing v. The Lilly Health Plan, 562 F3d 522 (3rd Cir. 2009), had the occasion to address the effect of Glenn on its previous jurisprudence by noting:

> Accordingly, we find that, in light of *Glenn*, our "sliding scale" approach is no longer valid. Instead, courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion. *Glenn*, 128 S.Ct. at 2350; *see Champion v. Black & Decker, (U.S.) Inc.*, 550 F.3d 353, 359 (4th cir. 2008) (abandoning sliding scale approach, after *Glenn*); *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1025 (9th Cir. 2008) (same); *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1357 (11th Cir. 2008) (same); *Wakkinen v.*

> *UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 581 (8th Cir. 2008)
> (same); *see also Michaels v. The Equitable Life Assur. Soc. of U.S.*
> *Employees, Managers, and Agents Long Term Disability Plan*, 305
> Fed.Appx. 896 (3rd Cir. 2009) (predicting the result we now reach:
> that, after *Glenn*, we will no longer apply the sliding-scale
> approach).  *But see Weber v. GE Group Life Assur. Co.*, 541 F.3d
> 1002, 1010-11 (10th Cir. 2008) (holding that the sliding scale
> approach mirrors *Glenn*'s approach).
>
>          As *Glenn* recognized, benefits determinations arise in many
> different contexts and circumstances, and, therefore, the factors to
> be considered will be varied and case-specific.  *Glenn*, 128 S.Ct. at
> 2351.  In *Glenn*, factors included procedural concerns about the
> administrator's decision making process and structural concerns
> about the conflict of interest inherent in the way the ERISA-
> governed plan was funded; in another case, the facts may present
> an entirely different set of considerations.  *Id.* at 2351-52.  After
> *Glenn*, however, it is clear that courts should "take account of
> several different considerations of which a conflict of interest is
> one," and reach a result by weighing all of those considerations.
> *Id.* at 2351.

<u>Schwing</u>, 562 F.3d at 525-26.[6]

It is with these post-<u>Glenn</u> principles in mind that I turn to an examination as to whether

the denial of benefits in this case is supportable as a legitimate exercise of the Defendant's

discretion or was arbitrary and capricious.[7]

### III. DISCUSSION

As discussed more fully above, the Plaintiff's claim of disability in this case is premised

primarily on her contention that she suffers from debilitating fatigue and significant memory and

concentration problems caused by chronic fatigue syndrome or fibromyalgia.  Broadly speaking, I

find that the denial of benefits was arbitrary and capricious because the medical evidence

submitted in support of the Plaintiff's claim by her treating physicians was rejected in favor of

---

[6]Post-<u>Glenn</u>, examples of case-specific factors considered by the courts have included: (1) incorrectly
classifying the plaintiff's job activity level despite the recommendation a vocational case manager; (2) ignoring
recommendations from the reviewing physicians regarding the evaluation of the plaintiff's claim; <u>see</u> <u>Cully v. Liberty</u>
<u>Life Assurance Co. of Boston</u>, 2009 WL 2143107 at *3-4 (3rd Cir. 2009); (3) selectively considering the available
evidence by relying solely upon the paper review reports of the plan's experts while giving "scant weight" to the
contrary, more detailed reports of the plaintiff's treating physicians; <u>see</u> <u>Schwarzwaelder v. Merrill Lynch & Co.,</u>
<u>Inc.</u>, 606 F. Supp. 2d 546, 558-59 (W.D.Pa. 2009); and (4) failing to adequately identify the documentation
necessary to perfect the claim; <u>see</u> <u>Kao v. Aetna Life Ins. Co.</u>, __ F. Supp. 2d __, 2009 WL 2601104 at *11(D.N.J.
2009).

[7]Defendant concedes that a financial conflict exists in this case because the Defendant was "both deciding
the claim and paying the claim from its assets."  <u>See</u> Status Conference Tr. (August 13, 2009) pp. 2-3 [Doc. No. 24].

paper-review reports which were, in large measure, conclusory and/or failed to meaningfully address the true substance of the Plaintiff's claims.  Like the court in Schwarzwaelder v. Merrill Lynch & Co., Inc., 606 F. Supp. 2d 546 (W.D.Pa. 2009), I find:

> ... [Defendant's] selective consideration of the available evidence, including reliance upon the solely paper-review reports of its experts while giving scant weight to the contrary, more detailed, and consistent reports of claimant's three treating/evaluating physicians, troubling. ...

Id. at 558.

Here, Defendant's initial denial of benefits on October 30, 2007 and its subsequent denial on February 12, 2008 was the product of a paper review by two registered nurses.  Not only did the denials fail to meaningful address the substance of the substantial medical documentation submitted in support of Plaintiff's claims relative to her chronic fatigue and memory problems, they inappropriately required objective medical evidence to support aspects of the Plaintiff's claims:

> ...Your file does not contain imaging or testing such as an EEG or MRI to indicate evidence or physical findings regarding reports of migraines and memory problems. ...

(AR 0150).  Moreover, the Defendant concluded, incorrectly, in its denial of February 12, 2008, that the Plaintiff's sleep studies revealed no significant findings.

Dr. Goldfarb, however, in his comprehensive letter of April 3, 2008, fully explained the basis for his diagnosis of chronic fatigue syndrome and fibromyalgia, as well as his conclusion that the Plaintiff's constant fatigue and memory and concentration problems prevented her from performing her job responsibilities.  He pointed out, for instance, that Dr. Ray's assessment dated December 20, 2007 confirmed "limitations in [the Plaintiff's] memory and sustained concentration".  (AR 0134).  He also observed that the Defendant's characterization of the Plaintiff's sleep study as revealing "no significant findings" was "inaccurate":

> ...In Ms. Henderson's letter she claims the sleep study "showed no significant findings."  This is inaccurate.  The report states "This sleep study is mildly abnormal.  There was prolonged sleep latency and frequent arousals with several prolonged awaking periods during the night.... It demonstrated reduction in total sleep time; reduced sleep efficiency and absence of slow wave sleep time and REM sleep time.  This is consistent with sleep initiation and maintenance insomnia."  Upon reviewing the actual findings, there is absolutely no stage 3, stage 4 or REM sleep.  Mrs. Engel spent the vast majority of her sleep time in stage 2 sleep.  In order for

> someone to obtain rejuvenating sleep, she must spend a significant
> portion of her sleep in stage 3 and 4.  Mrs. Engel had none and
> despite spending upwards to 12 to 13 hours sleeping she never
> wakens refreshed. ...

(AR 0135).  Dr. Goldfarb also criticized the Defendant's insistence on objective medical data:

> As far as the summary portion of the denial letter, I would like to
> emphasize that CFIDS and fibromyalgia are clinical diagnoses.
> There are no definitive lab studies or imaging studies that confirm
> or refute either of these diagnoses.  Neither an EEG or MRI will
> provide useful information regarding migraine headaches or
> memory problems.  The sleep study is certainly abnormal.
> Cognitive testing is unnecessary.  Irritable bowel syndrome is again
> a clinical diagnosis and Mrs. Engel has symptoms consistent with
> this diagnosis.  There are abnormal musculoskeletal signs on
> physical examination that again are consistent with the above
> mentioned disorders; namely, hyperreflexia and delayed relaxation
> phase as well as multiple trigger points.

> Mrs. Engel meets the criteria for CFIDS and fibromyalgia and is
> currently at a level of dysfunction to place her on disability.

(AR 0135).

Upon receipt of Dr. Goldfarb's detailed report of April 3, 2008, Defendant requested yet another paper review from Dr. Payne.  Dr. Payne noted, for instance, that "the treatment data supports therapies for depression, chronic pain, and sleep problems" and he acknowledged the diagnosis of fibromyalgia.  (AR 0106).  He concluded, however, that the Plaintiff had no physical or functional impairments that would prevent her from performing the essential function of her job from a "rheumatology viewpoint."  (AR 0106).  Recognizing the "ships passing in the night" nature of Dr. Payne's report, Dr. Goldfarb once again weighed in.  He emphasized that it was inappropriate to view the Plaintiff's claim, as Dr. Payne had, through a narrow rheumatological "lens":

> ...Mrs. Engel never claimed to have a rheumatologic basis for her
> inability to perform her duties at work.  While she is in pain and
> does have some rheumatologic findings consistent with
> fibromyalgia (ie multiple tender points, hyper-reflexia and delayed
> relaxation of deep tendon reflexes,) Mrs. Engel's major complaints
> are debilitating fatigue, inability to concentrate and limitations in
> memory. ...

(AR 0089).  He also reiterated the findings in Dr. Ray's assessment of December 12, 2007 and the fact that the sleep study, contrary to Dr. Payne's characterization, revealed a "severe dysfunction of sleep stages with no slow wave or REM sleep."  (AR 0089).

22

A review of the Mental Health Case Review submitted by Dr. Francis reveals that it does not meaningfully address the Plaintiff's treating physicians' contentions that she suffers from severe, debilitating chronic fatigue and memory problems caused by her chronic fatigue syndrome and fibromyalgia. It is also worth noting that in the Defendant's final denial letter of July 7, 2008, it does **not** contest the fact that the Plaintiff suffers from fibromyalgia and chronic fatigue syndrome, but concludes that the medical records "[do not] support a mental health condition or memory problems **severe enough** to support restrictions and limitations to render her unable to perform the main duties of her occupation as a director of clinical services." (AR 0070) (emphasis supplied). The problem with this conclusory statement is two-fold. First, the Plaintiff's fatigue and memory and concentration problems were the result of diagnosed medical conditions, fibromyalgia and chronic fatigue syndrome, rather than "mental health conditions." Second, however they are characterized, the Defendant's conclusion that they were not sufficiently "severe" is patently unsupportable on this record. Defendant consistently rejected the Plaintiff's subjective reports as to the nature and severity of her chronic fatigue and memory and concentration problems without a reasonable basis. Schwarzwaelder, 606 F. Supp. 2d at 561 (citing Adams v. Metropolitan Life Ins. Co., 549 F. Supp. 2d 775 (M.D.La. 2007) (finding for plaintiff where MetLife's benefit denial relied on multiple paper-review consultants who disregarded "subjective" and "self-reported" evidence, and rejected conclusions of treating/evaluating physicians)).

Finally, although Defendant requested a copy of the Plaintiff' job description, it did not give meaningful consideration as to how the Plaintiff's chronic fatigue, as well as memory and concentration problems, would impact upon her performance. As a supervisor, Plaintiff was required to function in a stressful environment which required constant interaction with subordinates and others, and the daily utilization of verbal and written communication skills. Given the nature of her responsibilities, the impact caused by her chronic fatigue and memory and concentration problems would be significant. In contrast, both Dr. Ray and Dr. Goldfarb specifically considered the nature of the Plaintiff's responsibilities in rendering their opinions as to her ability to perform her job. An administrator's failure to properly consider evidence of plaintiff's specific job responsibilities is an abuse of discretion. See Elms v. Prudential Ins. Co. v. America, 2008 WL 4444269 at *16, *20-*21 (E.D.Pa. 2008).

**IV. Conclusion**

For the foregoing reasons, I find that the Defendant's rejection of benefits in this case was not a principled exercise of its discretion but was arbitrary and capricious.  Consequently, the Defendant's motion for summary judgment will be denied and the Plaintiff's motion will be granted.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ANNETTE ENGEL,                    )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        Civil Action No. 08-240 Erie
                                  )
JEFFERSON PILOT FINANCIAL         )
INSURANCE COMPANY,                )
                                  )
                Defendant.        )

**ORDER**

AND NOW, this 28th day of September, 2009, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 13] is GRANTED, and the Defendant's Motion for Summary Judgment [Doc. No. 17] is DENIED.  JUDGMENT is hereby entered in favor of the Plaintiff, Annette Engel, and against the Defendant, Jefferson Pilot Financial Insurance Company.

The clerk is hereby directed to mark the case closed.

/s Sean J. McLaughlin
United States District Judge

cm: All parties of record. __

25